**Edward A. COX, III, Petitioner,**

*v.*

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 97–1225.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1997.

Decided March 4, 1998.

Tyrone C. Fahner, Keith C. Hannigan, Marshall E. Hanbury (argued), Mayer, Brown & Platt, Chicago, IL, for Petitioner.

Jay L. Witkin, William S. Liebman (argued), Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, Joseph A. McHatton, Commodity Futures Trading Commission, Chicago, IL, for Respondent.

Before CUMMINGS, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Edward A. Cox, III, petitions for review of a final order of the Commodity Futures Trading Commission ("Commission") entered in January 1997, which revokes his floor broker registration and bars him permanently from trading in any market regulated by the Commission. Because this administrative sanction followed a criminal sentence for the same conduct, Cox claims the Commission's order violates the Double Jeopardy Clause of the Fifth Amendment. Cox also claims the Commission abused its discretion by failing to give appropriate weight to evidence of Cox's rehabilitation.

Following the recent Supreme Court decision in *Hudson v. United States*, —— U.S. ——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), we conclude that the administrative sanction is not a criminal punishment, and therefore the Double Jeopardy Clause does not prohibit its imposition following criminal sentencing for the same conduct. Because we also find that the Commission did not abuse its discretion, we affirm the Commission's order.

## I. History

In January 1991, Edward A. Cox was convicted on forty-six felony counts, consisting of twenty-seven counts of violating the antifraud provisions of § 4b of the Commodity Exchange Act ("the Act"),[1] 7 U.S.C. § 6b, thirteen counts of mail fraud, five counts of wire fraud, and one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act. Cox was also convicted of ten misdemeanor counts of entering into prearranged accommodation trades in violation of § 4c(a)(A) of the Act, 7 U.S.C. § 6c(a)(A). In May 1991, the United States District Court for the Northern District of Illinois sentenced Cox to thirty months imprisonment and three years of supervised release and ordered him to pay over $15,000 in restitution.

While serving his sentence, Cox volunteered for the Intensive Confinement Program, a prisoners' "boot camp" of sorts. By successfully completing this program, Cox earned a six month reduction in his prison term. Following his release from prison, Cox spent eight to nine months in the Community Correctional Center, a Chicago halfway house. He also returned to the Chicago Board of Trade ("CBOT") and traded under the floor privileges of his floor broker license. Cox asserts that since his return to trading

---

1. This opinion, in accordance with Commission custom, will use the original public law section numbers in citing the Commodity Exchange Act. *See LaCrosse v. CFTC*, 137 F.3d 925, 927 n. 1 (7th Cir.1998). Each time a new section is introduced, however, the corresponding U.S.C. reference will be included.

The Act was amended in 1992 by the Futures Trading Practices Act of 1992. All conduct relevant to this appeal occurred prior to this amendment. Thus this opinion will refer to the Act as it existed prior to the 1992 amendments.

he has committed no violations of the Act or CBOT rules.

In June 1991, the Commission filed a multi-count administrative complaint against Cox based upon the conduct underlying the criminal convictions. The Administrative Law Judge ("ALJ") granted summary disposition as to Cox's liability and ordered the parties to brief the issue of sanctions. In December 1992, without a hearing, the ALJ issued an initial decision imposing a cease and desist order, revoking Cox's registration and banning Cox from trading on all markets regulated by the Commission for ten years. *See In re Cox*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,628, No. 91–14, 1992 WL 379242, at *4–*5 (ALJ Dec. 16, 1992). Both sides appealed to the Commission.

On appeal, the Commission held that the ALJ had abused its discretion by failing to provide for a hearing on the sanctions issue, and therefore the Commission remanded the case to the ALJ. *See In re Cox*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,826, No. 91–14, 1993 WL 316016, at *3 (C.F.T.C. Aug. 13, 1993) [hereinafter *Cox I*]. The Commission also addressed the impact of multiple convictions on the § 9(b), 7 U.S.C. § 13(b), statutory presumption that a respondent should be banned from trading for five years for *one* § 4b felony conviction. The Commission stated that conviction of more than five § 4b felonies creates a presumption that the respondent should permanently be barred from trading because of the risk to market integrity. *See id.* at *5. The Commission, therefore, directed the ALJ to ban Cox permanently from trading unless he could show, by the weight of the evidence, that his continued access to the markets would pose no substantial risk to their integrity. *See id.* The Commission suggested that, in preparing rebuttal evidence, Cox should focus on the following factors: (1) the nexus between his wrongdoing and a threat to the market mechanism; (2) mitigating circumstances; (3) evidence of rehabilitation; and (4) the role Cox intends to play in the markets regulated by the Commission. *See id.* at *4–*5.

In May 1995, the ALJ issued a second order. The ALJ found that Cox was rehabilitated and posed no threat to the markets, basing his conclusion on Cox's participation in the Intensive Confinement Program, the testimony of character witnesses, the passage of time since his misconduct, the fact that Cox had been trading for two years without incident, and that the CBOT passed a resolution stating it found Cox was rehabilitated. *See In re Cox*, [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,406 at 42,807–09 (ALJ May 15, 1995). The ALJ thus declined to revoke Cox's floor broker's registration or impose any trading ban. *See id.* at 42,809. The Division of Enforcement appealed to the Commission.

In January 1997, the Commission issued its final order. The Commission gave little weight to Cox's evidence of rehabilitation and found that Cox had failed to show by clear and convincing evidence that his continued registration would pose no substantial risk to the markets. *See In re Cox*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,939, No. 91–14, 1997 WL 20733, at *11 (C.F.T.C. Jan. 17, 1997) [hereinafter *Cox II*]. The Commission therefore revoked Cox's registration as a floor broker. The Commission also concluded that Cox had failed to show by the weight of the evidence that his continued trading on markets regulated by the Commission would pose no substantial risk to their integrity. *See id.* at *12. The Commission accordingly permanently banned Cox from trading on markets regulated by the Commission. Cox appeals the Commission's order to this Court.

## II. ANALYSIS

We will disturb the Commission's factual determinations only if they are not supported by the weight of the evidence. *See Monieson v. CFTC*, 996 F.2d 852, 858 (7th Cir.1993); *Gimbel v. CFTC*, 872 F.2d 196, 199 (7th Cir.1989). "Review of legal questions, or of the application of law to facts, depends on the nature of the question and the comparative qualifications and competence of the decisionmakers." *Monieson*, 996 F.2d at 858; *see also Morris v. CFTC*, 980 F.2d 1289, 1292 (9th Cir.1992). We ap-

ply a deferential standard to questions of law encompassed by the agency's expertise, so long as the agency's conclusion is a reasonable one. *See Monieson*, 996 F.2d at 858. "When the question is of the sort that courts commonly encounter, de novo review is proper." *Id.* With regard to the agency's imposition of sanctions, the choice of sanction "[is] not to be overturned unless the Court of Appeals might find it 'unwarranted in law or ... without justification in fact.'" *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946)). If the agency's sanction falls within the statutory limits, it "must be upheld unless it reflects an abuse of discretion." *Flaxman v. CFTC*, 697 F.2d 782, 789 (7th Cir.1983); *see also Monieson*, 996 F.2d at 858.

## A. Double Jeopardy Analysis

Our inquiry in this matter is controlled by the Supreme Court decision in *Hudson v. United States*, ── U.S. ──, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), and our recent decision in *LaCrosse*, 137 F.3d 925 (7th Cir.1998). In *Hudson*, the Supreme Court noted that the Double Jeopardy Clause "protects only against multiple *criminal* punishments for the same offense." *Hudson*, at ──, 118 S.Ct. at 493 (emphasis added). The Court therefore established a test that focuses on whether the sanction at issue may properly be deemed "criminal." *See id.* at ── ──, 118 S.Ct. at 492–94.

■ In *LaCrosse* we determined that the Commission's imposition of a trading ban, pursuant to § 9(b) of the Act, after a criminal conviction for the same conduct did not implicate double jeopardy concerns. *See LaCrosse*, 137 F.3d at 925–32. Following the reasoning in *LaCrosse*, we find Cox's argument that the trading ban violated his protections against double jeopardy to be unavailing.

■ However, in *LaCrosse* we did not have occasion to address the double jeopardy implications of registration revocation under §§ 8a(2)(D) and (E) of the Act, 7 U.S.C. §§ 12a(2)(D) and (E). Therefore we must analyze this sanction under the *Hudson* framework to determine whether it is sufficiently "criminal" to trigger Cox's double jeopardy protections.

■ The first step in our analysis is to determine whether the legislature " 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Hudson*, at ──, 118 S.Ct. at 493 (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980)). Sections 8a(2)(D) and (E) establish that, with a hearing, the Commission may revoke the registration of any person who has been convicted of certain enumerated felonies, *see* 7 U.S.C. § 12a(2)(D), or who "has been found by any court of competent jurisdiction, by the Commission or any Federal or State agency or other governmental body, or by agreement of settlement to which [any of the above entities] is a party," to have violated certain enumerated statutes, rules, regulations, and orders, or to have aided and abetted such a violation. 7 U.S.C. § 12a(2)(E). Although these provisions do not contain language expressly deeming them "civil" sanctions, the fact that the *Commission* has the authority to revoke the registration is significant. "That such authority was conferred upon [an] administrative agenc[y] is prima facie evidence that Congress intended to provide for a civil sanction." *Hudson*, at ──, 118 S.Ct. at 495. There is *no* evidence that suggests Congress intended otherwise. Therefore we find that the legislature "indicated an intention to establish a civil penalty." *Ward*, 448 U.S. at 248, 100 S.Ct. at 2641.

■ Turning to the second stage of analysis, we must determine whether, notwithstanding this legislative preference, the sanction operates in such a way as to transform it into a criminal penalty. Our inquiry is structured according to the factors enumerated in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963).

The first factor asks whether the sanction acts as an affirmative disability or restraint. The *Hudson* court understood this factor to mean that the sanction in question smacks of

the infamous punishment of imprisonment. *See Hudson*, at ——, 118 S.Ct. at 495–96. While a registration revocation certainly keeps respondent from engaging in certain activities, it does not approach the infamous punishment of imprisonment. *See id.* (holding that occupational debarment "is 'certainly nothing approaching the "infamous punishment" of imprisonment' ") (quoting *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960)).

The second *Kennedy* factor asks whether the sanction has been historically viewed as punishment. In *Hudson*, the Supreme Court recognized that " 'revocation of a privilege voluntarily granted . . . is characteristically free of the punitive criminal element.' " *Id.* (quoting *Helvering*, 303 U.S. at 399 & n. 2, 58 S.Ct. at 633 & n. 2). Because the Commission has discretion in approving registrants, registration epitomizes a "privilege voluntarily granted." Therefore revocation of such privilege is not a sanction historically viewed as punishment.

The third *Kennedy* factor asks "whether the sanction comes into play only on a finding of scienter." Sections 8a(2)(D) and (E) authorize the Commission to refuse to register, register conditionally, or revoke the registration of any person who has been convicted of certain crimes or who has been found to have violated certain enumerated statutes. Several of the relevant crimes and statutes listed in §§ 8a(2)(D) and (E) do not require scienter. *See, e.g.*, 7 U.S.C. § 12a(2)(D) (With hearing, Commission may revoke registration of person convicted of a "felony . . . concerning a security."); 7 U.S.C. § 12a(2)(E) (With hearing, Commission may revoke registration of person found to have violated any provision of the Securities Act of 1933.). The sanction thus does not come into play only on a finding of scienter.

 The fourth factor asks whether the operation of the sanction will promote the traditional aims of punishment, i.e. retribution and deterrence. While revoking a person's registration will likely deter the transgressor and others from future illegal conduct, "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.' " *Hudson*, at ——, 118 S.Ct. at 496 (quoting *United States v. Ursery*, 518 U.S. 267, ——, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996)). Registration revocation primarily serves the civil goal of protecting the integrity of the public markets. The Commission's standard for continued registration makes this clear. Although conviction of one of the listed crimes gives rise to a presumption that a person is unfit for registration, a person may retain his registration by making a clear and convincing showing that his continued registration would not pose a substantial risk to the markets. *See* Commission Rule 3.60(e)(1), 17 C.F.R. § 3.60(e)(1). The purpose of the sanction, then, is to promote the civil goal of market integrity. The fact that the sanction also deters future illegal conduct does not transform the sanction into one created to "promote the traditional aims of punishment."

 We next examine whether the behavior to which the sanction applies is already a crime. Section 8a(2)(D) requires *conviction* of a felony, so clearly the relevant behavior is already criminal. Section 8a(2)(E), while not requiring conviction, requires that the person be found to have violated certain statutes, rules, regulations or orders under such statutes. Thus again the conduct to which the sanction applies is already prohibited. However, "[t]his fact is insufficient to render the . . . sanctions criminally punitive . . . particularly in the double jeopardy context, *see United States v. Dixon* 509 U.S. 688, 704, 113 S.Ct. 2849 [2860], 125 L.Ed.2d 556 (1993) (rejecting 'same-conduct' test for double jeopardy purposes)." *Hudson*, at ——, 118 S.Ct. at 496 (citation omitted).

We consider the final two *Kennedy* factors together: whether there is an alternative purpose for the sanction and whether the sanction appears excessive in relation to the alternative purpose assigned. We take "alternative purpose" to mean a purpose other than a punitive purpose; in this case the alternative purpose for the sanction is the actual intended purpose: to ensure integrity of the markets. Sections 8a(2)(D) and (E) create a presumption that the per-

son is unfit for registration and the operation of the presumption is not disproportionate to its purpose. Indeed, the Commission has the authority to grant the registration if the registrant shows he does not pose a threat to the market. Additionally, revocation is not the only option available to the Commission; the Commission may also register conditionally, suspend, or place restrictions on the registration of any person found to have been convicted of a felony or to have engaged in the requisite behavior. Because the Commission is charged with protecting the integrity of the markets, and it has discretion regarding the appropriate sanction, §§ 8a(2)(D) and (E) do not create an "excessive" sanction.

In sum, only one factor suggests the sanction at issue is a "criminal" one: the behavior to which the sanction applies is already prohibited. Based on our analysis of all of the factors, this does not constitute the requisite clear proof required to "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at ——, 118 S.Ct. at 493. We therefore hold that revocation of a registration pursuant to §§ 8a(2)(D) and (E) of the Commodity Exchange Act is not "criminal" for the purposes of the Double Jeopardy Clause. The Double Jeopardy Clause does not bar the imposition of this sanction after criminal sentencing for the same conduct.

**B. Cox's Claim that the Commission Abused its Discretion by Revoking His Registration and Imposing a Permanent Trading Ban**

According to the Commission, Cox's statutory disqualifications under §§ 8a(2)(D) and (E) of the Act give rise to a presumption that he is unfit to act as a Commission registrant. *See In re Horn*, [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,836 at 36,939 (C.F.T.C. April 18, 1990). Similarly, the Commission asserts that Cox's twenty-seven felony convictions under § 4b of the Act give rise to the presumption that he should be permanently banned from trad-

ing pursuant to § 9(b) of the Act. *See Cox I*, 1993 WL 316016, at *5. To retain his registration, the Commission requires Cox to make a clear and convincing showing that his continued registration would pose no substantial risk to the public, *see In re Horn*, [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,836 at 36,939 n. 15, while the Commission will allow him to avoid a trading ban if he makes the same showing by the weight of the evidence, *see Cox I*, 1993 WL 316016, at *4.[2]

The onus was upon Cox to show, either by clear and convincing evidence (in the case of continued registration) or the less onerous standard of the weight of the evidence (in the case of the trading ban), that he posed no substantial risk to the markets. In his appeal, Cox focuses on his evidence of rehabilitation. Cox asserts that because his evidence of rehabilitation was overwhelming, he proved that he posed no risk to the markets. Cox claims that the Commission abused its discretion by not giving appropriate weight to the rehabilitation evidence and thus the Commission erred in revoking his registration and imposing a permanent trading ban. Specifically, Cox argues that the Commission did not give appropriate weight to his acceptance of responsibility, the testimony of his character witnesses, that he has been trading since 1992 without incident, his participation in the Intensive Confinement Program, and the CBOT Resolution. We address these claims in turn.

First, Cox asserts that the Commission did not give the appropriate weight to evidence of his acceptance of responsibility. Cox's principal piece of evidence supporting the conclusion that he accepted responsibility for his actions is the fact that at sentencing he received a two-level decrease for acceptance of responsibility. The Commission noted this downward departure but found that, "[i]n the circumstances presented, however, Cox's acceptance of responsibility amounts to only limited first steps on the path of rehabilitation." *Cox II*, 1997 WL 20733, at *9.

---

**2.** These presumptions and their corresponding burdens are Commission interpretations of the relevant statutes. Since the parties have not challenged these interpretations, we apply these standards but do not vouch for their correctness.

The Commission supported its conclusion by noting that "expressions of contrition following detection only deserve significant weight if the wrongful nature of the conduct was unclear at the time of the violations." *Id.* Because the Commission found that Cox had not shown he was confused about the illegality of his actions, the Commission did not give his expressions of regret decisive weight. The Commission also stated that Cox "did not appreciate the gravity of his misconduct when he took responsibility for his actions," *id.*, citing as support the fact Cox maintained that he had not intended to harm his customers and that he did not cause his customers to lose money. *See id.* The Commission did not challenge the conclusion that Cox had accepted responsibility, but instead found that his acceptance of responsibility was entitled to less weight given his particular circumstances. This finding does not constitute an abuse of discretion.

However, the Commission came close to crossing the line in presenting its final piece of evidence to support its conclusion that Cox's acceptance of responsibility is not entitled to significant weight. The Commission mischaracterized Cox's testimony before the ALJ by excising a relevant portion, stating, "Cox only grudgingly acknowledged under cross-examination that he had 'probably ... harmed [his] customers.'" *Id.* at *9. Cox's actual words were, "[a]fter all I've been through, I would probably have to say that, yes, I harmed my customers." Hr'g Tr. at 233, *In re Cox*, [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,406 (ALJ May 15, 1995). This mischaracterization of the respondent's testimony is inappropriate and presents a close call as an abuse of discretion. However, the weight of the Commission's decision regarding Cox's acceptance of responsibility does not rest on this misquotation, and we therefore are not inclined to reverse on this issue.

Second, Cox argues that the Commission abused its discretion by not giving appropriate weight to the testimony of his character witnesses. Cox called twenty-four traders and executives on his behalf. Some knew him personally for years, some only knew him as a trader, some knew him prior to his conviction while others had come to know him after the conviction. The Commission did not afford significant weight to the testimony of the witnesses because none of the witnesses was qualified as experts in rehabilitation. *See Cox II*, 1997 WL 20733, at *9. In comparison, the Commission cited *In re Walter*, a case in which a probation officer, "who worked closely with respondent for a significant period after his conviction, had experience and expertise that buttressed the reliability of his opinion that respondent did not present negative risk to community." *Id.* Because none of Cox's witnesses possessed these characteristics, the Commission felt their opinions were entitled to only limited weight.

While we recognize the reasonableness of according an expert's testimony more weight than a layman's, we must confess some confusion on the question of who satisfies the Commission's definition of "expert." Apparently a probation officer will suffice, and business and personal associates will not. But a respondent has very little guidance from the Commission other than these outside parameters. Would a psychologist suffice? Or a social worker? Because the Commission has not set forth the criteria for deeming a person an "expert in rehabilitation," the answers to these questions remain elusive. As we stated in *LaCrosse*, 137 F.3d at 934 n. 5:

> The concept of a "rehabilitation expert" is novel. Predicting future crimes is a roll of the dice; there are no genuine "experts" about who is likely to commit which offenses tomorrow, or even what classes of persons pose genuine risk.... By failing to set forth the relevant and necessary characteristics for rehabilitation experts, the Commission gives itself free rein to discredit any manner of testimony.

For the opportunity to present witnesses on the issue of rehabilitation to be meaningful, the Commission must establish some guidelines regarding the kind of testimony it will accept.

Notwithstanding the Commission's lack of instruction on this issue, we do not hold that the Commission abused its discretion in determining the weight to afford this testimo-

ny. The Commission offered other reasons for according limited weight to the testimony, including the fact that Cox's character witnesses were traders, brokers and exchange officials at the CBOT who, in the Commission's estimation, "evaluated Cox's conduct and character in light of the CBOT's internal rules and traditions" as opposed to in light of the requirements of the Act or the Commission's regulations. *Id.* at *10. The Commission had legitimate reasons for affording the character testimony little weight, and accordingly the Commission did not abuse its discretion.

Third, Cox asserts that the fact he has been trading without incident for several years should have been weighty evidence demonstrating rehabilitation. The Commission's precedent makes clear that such evidence is instructive on the question of rehabilitation, but not dispositive. *See In re Bryant,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,847, No. CRAA 88–3, 1990 WL 282904, at *9 (C.F.T.C. April 18, 1990) (noting that absence of wrongful conduct "may be a factor indicating rehabilitation"); *In re Akar,* [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,927, No. 82–29, 1986 WL 66157, at *8 (C.F.T.C. Feb. 24, 1986) ("[T]hough not determinative, time is a 'relevant factor' in the Commission's consideration as to whether an applicant has been rehabilitated."). When respondent is subject to an outstanding administrative complaint, however, the Commission has stated that "the weight accorded such evidence must be limited. . . ." *In re LaCrosse,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,944, Nos. 90–20 and SD 91–6, 1997 WL 20731, at *10 (C.F.T.C. Jan. 21, 1997), *aff'd,* 137 F.3d 925 (7th Cir.1998). We fail to find an abuse of discretion in the Commission's decision to accord less weight to Cox's evidence in recognition of the incentives provided by an ongoing investigation. It was reasonable and in accordance with Commission precedent.

Fourth, Cox complains that the Commission failed to mention his successful completion of the Intensive Confinement Program in its analysis of the rehabilitation evidence. Cox argues that the Commission erred by not considering this evidence. Cox fails to recognize that the Commission did note his successful completion of the program, stating "Cox further claims that his successful completion of his intensive confinement program demonstrates further remorse for his wrongdoing." *Cox II,* 1997 WL 20733, at *9. While the Commission did not engage in a lengthy analysis of the program or its effects, it is clear that the Commission was aware of Cox's participation and his claims regarding the program. We do not require the Commission to analyze in its order each and every piece of evidence submitted by the respondent; it is sufficient that the Commission makes a decision based on consideration of the entire record before it. The Commission engaged in a thorough analysis of the relevant evidence and dedicated substantial time to the issues before it. The fact that the Commission did not explicitly discuss Cox's completion of the Program does not establish that the Commission abused its discretion. *Accord In re LaCrosse,* slip op. at 17–18.

Finally, Cox argues that the Commission abused its discretion by downplaying the importance of the Resolution of the CBOT that Cox poses no threat to the integrity of the markets. We find that the Commission proffered several legitimate reasons for affording the CBOT Resolution minimal weight. First, the statements in the Resolution are so general that the Commission "question[ed] their usefulness." *Cox II,* 1997 WL 20733, at *10. Specifically the Commission noted that the Resolution failed to state how Cox's current behavior is sufficient to rebut the presumption that he is unfit for registration or continued trading on the markets. *See id.* In addition, the Commission found that the Resolution evidenced little concern with the harm that befell Cox's customers—an interest of paramount importance to the Commission. Finally, the Commission reiterated its viewpoint that Cox's postconviction record has little probative value when he has been subject to an outstanding administrative complaint. *See id.* We find no abuse of discretion in the Commission's treatment of the CBOT Resolution.

In sum, the Commission did not abuse its discretion in its consideration of the evidence of rehabilitation Cox proffered. Cox had to show that he no longer posed a threat to the market. In the case of continued registration, Cox had to make this showing by clear and convincing evidence. In regard to the trading ban, the Commission required Cox to make the showing by the weight of the evidence. The Commission did not abuse its discretion in analyzing Cox's evidence of rehabilitation, and given the weight afforded the evidence, the Commission did not abuse its discretion in finding that Cox had not made the requisite showing under either standard.

We find Cox's arguments based on the Double Jeopardy Clause and abuse of discretion to be unpersuasive. We therefore EN-FORCE the order of the Commodity Futures Trading Commission.